UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

FILED
00 JAN 10 AM 9:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
JAN 10 2000

MARION WEBB, LEROY QUALLS, )
BRADLEY TIPPER, OMEGA )
SMITH, DAVID SLATON, )
CHARLES GRAY, DANNY )
GILCHRIST, JOSEPH BROADFOOT, )
and DANIEL PARKER, )
)
  Plaintiffs, )
)
vs. ) Civil Action No. CV-99-S-443-NW
)
GEORGIA GULF CORPORATION, )
LORD CHEMICAL PRODUCTS, )
BEAVER ADHESIVES, INC., )
MONSANTO COMPANY, and )
OCCIDENTAL CHEMICAL )
CORPORATION, )
)
  Defendants. )

MEMORANDUM OPINION

During the period relevant to the claims asserted in this action, plaintiffs were employed by Domco Floor Products, Inc. ("Domco") at its plant in Florence, Alabama. Defendants manufactured various products that Domco used in the course of its manufacturing processes. Plaintiffs have, on three separate occasions, attempted to plead claims for personal injuries allegedly resulting from exposure to chemicals contained in some or all of the various products sold by defendants to Domco. Such claims originally were asserted by ten plaintiffs against sixteen

103

defendants. The parties have winnowed to nine plaintiffs[1] and five defendants.[2] The action presently is before the court on motions to dismiss plaintiffs' second amended complaint filed by all remaining defendants, *i.e.*, Georgia Gulf Corporation ("Georgia Gulf"), Lord Chemical Products ("Lord Chemical"), Beaver Adhesives, Inc. ("Beaver Adhesives"), Monsanto Company ("Monsanto"), and Occidental Chemical Corporation ("Occidental"). In addition, Occidental moved to strike the affidavit of Dr. Richard Lipsey, submitted as part of plaintiffs' second amended complaint. Beaver Adhesives and Monsanto joined that motion. Finally, Occidental moved for judgment on the pleadings. Upon consideration of the motions, plaintiffs' response, the pleadings, and oral arguments of counsel, this court finds the action is due to be dismissed.

---

[1] Original plaintiff Larry Brown is omitted from the second amended complaint. (*See* Second amended complaint (Doc. No. 84) at 1-2, listing parties.)

[2] Plaintiffs stipulated to a dismissal of defendant Union Carbide Corporation on May 21, 1999 (*see* Doc. No. 52), which the court approved and ordered on May 26, 1999. (*See* Doc. No. 57.)
Further, plaintiffs did not include ten original defendants in their second amended complaint. (*See id.* at 1 n.1.). These entities have been dismissed from the action: Ashland Chemical, Inc.; B.F. Goodrich Company; Certainteed Corporation; Formosa Plastics Corporation; Hickory Vinyl Corporation; ITW Devcon; Oxford Chemicals, Inc.; PPG Industries, Inc.; Rectorseal Corporation; and Shell Oil Company. (*See id.*) Eight of these ten defendants (excluding Hickory Vinyl Corporation and Rectorseal Corporation) have filed stipulations of dismissal with the court. (*See* Doc. Nos. 88, 89, 90, 91, 92, 93, 94, 97.)
Finally, the court clarified, in an order entered November 30, 1999 (*see* Doc. No. 98), that only the five entities named as defendants in the caption above remain as defendants to the action.

2

## I. PROCEDURAL BACKGROUND

Plaintiffs commenced this diversity action on February 24, 1999. Their initial complaint asserted claims for "negligent and/or wanton conduct, failure to warn, breach of contract, breach of warranty," and violations of the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). (Complaint (Doc. No. 1) ¶ 29.) That woefully deficient pleading was akin to a shotgun blast aimed in the general direction of the sixteen entities originally named as defendants. *See Cramer v. Florida*, 117 F.3d 1258, 1263 (11th Cir. 1997) ("Shotgun pleadings ... exact an intolerable toll on the trial court's docket, lead to unnecessary and unchannelled discovery, and impose unwarranted expense on the litigants, the court and the court's parajudicial personnel and resources.") (citations omitted). It was difficult to discern not only what injuries were sustained by each of the plaintiffs, but also how any of the defendants allegedly were responsible for such injuries.

Plaintiffs pinpointed no triggering event in their original complaint: "While in the course of their employment on the above mentioned evening, the plaintiffs were exposed to chemical products designed, manufactured and/or distributed by the defendants." (Complaint ¶ 21.) Even so, this court was led to believe, during oral argument of defendants' motions to dismiss the original

3

complaint, that the event precipitating plaintiffs' alleged exposure to defendants' products was a fire that had occurred at the Domco plant on February 24, 1997. That understanding led the court to suspect that plaintiffs' claims ultimately would be thwarted by the product misuse affirmative defense permitted under Alabama law.[3] The court, therefore, ordered plaintiffs to file a more definite statement of their claims. (*See* Order of Mar. 29, 1999 (Doc. No. 26).) Specifically, the court directed plaintiffs to make "clear and concise statement[s] of the[ir] claims ... as to each particular defendant and the relief sought from that

---

[3] That defense is articulated in a treatise on Alabama tort law as follows:

> The condition of the product at the time of the injury as compared to the time it was manufactured, and its environment of use, is particularly significant with regard to the necessary element as expressed in Atkins [*v. American Motors Corporation*, 335 So. 2d 134 (Ala. 1976)] and Casrell [*v. Altec Industries*, 335 So. 2d 128 (Ala. 1976)], <u>that it is expected to and does reach the user or consumer without substantial change in the condition in which it was sold</u>. The same operative facts, however, can also generate legal issues with respect to the foreseeability of use and thus its defectiveness *vel non*, a duty to warn regarding foreseeable uses and dangers thereby created, an affirmative defense of showing "no causal relation" between the defendant's activities and its defective condition, and contributory negligence and assumption of risk. Some or all of these issues are presented in cases where the defendant argues that the product is in a condition other than it was in when it left its manufacturer, or that it is being used in a manner other than intended by the manufacturer. As noted in *Casrell*, under the general denial defense, a defendant may offer evidence in rebuttal of plaintiff's *prima facie* case, in the form of a manufacturer proving that a defect, if any, occurred while in possession or in control of the distributor or retailer.

**Michael L. Roberts & Gregory S. Cusimano**, *Alabama Tort Law Handbook* § 19.6, at 320-21 (1990) (emphasis supplied) (footnotes omitted) (collecting cases).

4

defendant." (*Id.* at 1.)

Plaintiffs filed their first amended complaint on April 16, 1999. (Doc. No. 28.) They revised their claims to include alleged violations of the AEMLD, and assertions of negligent failure to warn, wantonness, and breach of warranty. (*See id.* ¶¶ 25-344.) Even though that pleading was unusually long, it still was deficient in significant respects. Each plaintiff failed to set forth his individual injuries. The significance of that omission lies in the fact that this is not a class action lawsuit. In order to afford defendants a fair opportunity to answer the allegations, it is necessary that each plaintiff articulate his independent basis for damages. Further, plaintiffs neglected to categorize what injuries were attributable to specific defendants. Their first amended complaint largely was a "cut and paste" effort with respect to each defendant. The same four claims were asserted *seriatim* against each defendant, in basically identical language. The only modification to this uniform pattern entailed the identification of a product allegedly manufactured by a particular defendant. Thus, following additional oral arguments, this court again ordered plaintiffs to make a more definite statement of their claims, saying in part:

5

>     Noticeably absent from plaintiffs' conceded
> "shotgun" complaint, however, are any allegations
> specifying the injuries particular plaintiffs have
> suffered and which products may be connected to the
> particular injuries of each plaintiff. Nothing in the
> complaint suggests a causal linkage between the general
> injuries alleged and the defendants' products which are
> somehow associated with plaintiffs' employer. These
> failures notwithstanding, plaintiffs have obtained
> doctors' reports which state that residue of certain
> chemicals were found in plaintiffs' organs. All of the
> information discussed above should be made available at
> this initial stage of litigation so that some defendants
> sprayed with pellets from the blast of this pleading may
> offer proof that their products are in no way implicated
> by plaintiffs' injuries and that, therefore, they should
> not be plaintiffs' targets.

(Doc. No. 59, at 5-6.) The court also dismissed plaintiffs' claims for breach of warranty against all defendants at that point in the proceedings. (*See id.* at 6.)

Plaintiffs first responded by introducing an affidavit from Dr. Andrew Brown, a physician who practices in Gadsden, Alabama, "specializ[ing] in Otolarenology [sic[4]] and Allergy diseases and also see[ing] and treat[ing] numerous patients with industrial chemical problems." (Brown affidavit (Doc. No. 66) ¶ 2.) Dr. Brown attempted to define a causal linkage between products manufactured by defendants and the symptoms exhibited by plaintiffs. (*Id.* ¶¶ 4, 6-9.) Although Brown personally examined

---

    [4] Otolaryngology is "[t]hat branch of medicine concerned with medical and surgical treatment of the head and neck, including the ears, nose, and throat." *Dorland's Illustrated Medical Dictionary* 1205 (28th ed. 1994).

6

all plaintiffs, he failed to itemize the particular maladies of each. Rather, he noted in general terms that "[t]hese plaintiffs have experienced multiple symptoms, including, but not limited to dizziness; severe headaches; nausea; breathing problems and other neurological problems." (*Id.* ¶ 6.) This court was not impressed by Brown's explanation, and observed:

> In his affidavit, Dr. Brown states that he has examined the plaintiffs in his Gadsden, Alabama office. Dr. Brown addresses the plaintiffs and their injuries only collectively. No distinction is made among plaintiffs with regard to specific symptoms or injuries, or with regard to particular chemicals that Dr. Brown opines <u>may</u> have caused injury to particular plaintiffs.
> ... [T]he <u>plaintiffs</u> currently show chemicals in their blood, <u>such as</u> Xylene, Benzine, 2 Methylpentane, 3 Methylpentane, Trimythylbenzine, Toluene, and n-Hexane. These substances are oxidized derivatives of compounds manufactured by <u>some or all</u> of these defendants.
> (Brown affidavit, ¶ 7 (emphasis supplied).) This affidavit, and thus plaintiffs' response, fails to cure the deficiencies of their shotgun pleadings.
> This court has underscored its use of the term "may" in the statement, "particular chemicals that Dr. Brown opines <u>may</u> have caused injury to particular plaintiffs" above, to underscore the lack of certainty in Dr. Brown's opinion. He says "[t]he presence of these chemicals in the plaintiffs' bodies indicate [sic] that the plaintiffs <u>were likely exposed</u> to the chemicals listed in the complaint." (Brown affidavit, ¶ 6 (emphasis supplied).) Dr. Brown is not certain that plaintiffs were even exposed to the listed chemicals, much less where or when they may have been so exposed.

(Order of July 20, 1999 (Doc. No. 70), at 3-4.)

Accordingly, the court ordered plaintiffs to amend their complaint yet again. In doing so, it noted that plaintiffs must satisfy a number of requirements in order to survive a motion to dismiss:

> [P]laintiffs should itemize or delineate for each plaintiff <u>at least</u> the following information in their final amended complaint: (1) each plaintiff's <u>particular injuries</u>; (2) which <u>chemicals</u>, or the residue of which chemicals, are or were <u>found in each individual plaintiff's bloodstream</u>; (3) which <u>individual defendants sold products</u> containing a particular, named chemical, or combination of such chemicals, <u>found in a particular plaintiff's blood</u>; and (4) how plaintiffs can establish <u>causation</u> in light of [*Ex parte Diversey Corporation*, 1999 WL 424352 (Ala. June 25, 1999)] ....

(*Id.* at 6-7 (emphasis supplied).) Further, the court authorized ninety days for all parties to conduct discovery. (*See id.* at 2.)

Plaintiffs filed their second amended complaint on October 26, 1999.[5] (*See* Doc. No. 84.) That pleading, which asserts claims solely under the AEMLD, is replete with accompanying exhibits, including an affidavit submitted by Dr. Richard Lipsey, who holds a Ph.D. in toxicology. (*See* Second amended complaint at Exhibits "1" - "18.")

Significantly, the second amended complaint alleges that

---

[5] The court notes that, in attempting to establish diversity jurisdiction, plaintiffs alleged an amount in controversy of more than $50,000 (see Second amended complaint ¶ 1), rather than the $75,000 requirement established in 28 U.S.C. § 1332(a).

8

plaintiffs' exposure to chemicals contained in products allegedly manufactured by some or all of the five, remaining defendants occurred not as the result of a fire in the Domco plant, but rather "when a ventilation fan went off-line causing the plant to be filled with smoke." (*Id.* ¶ 18.) The reader is not informed of the source of such "smoke," nor was this court better educated during oral arguments.[6]

## II. DISCUSSION

Because this court has gone beyond the pleadings to examine certain affidavits submitted by plaintiffs, it concludes that defendants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) should be treated as motions for summary judgment under Federal Rule of Civil Procedure 56.[7]

### A. Occidental's Motion to Strike

Occidental moves to strike the affidavit of Dr. Richard

---

[6] Plaintiffs' counsel confirmed during oral argument that the triggering event in this case was the overheating, and subsequent shutting-off, of a ventilator fan.

[7] Federal Rule of Civil Procedure 12(b) provides in part:

If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such motion by Rule 56.

9

Lipsey, submitted as Exhibit "2" to plaintiffs' second amended complaint, on the grounds that his statements do not meet the reliability standards enunciated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). It argues that Lipsey's testimony is irrelevant and unreliable, because it fails to "assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592, 113 S.Ct. at 2796. For the reasons set forth *infra*, in section II.B.4 of this opinion, the court agrees with Occidental and concludes that Lipsey's affidavit would not assist a jury in understanding or determining alleged facts in issue, particularly those relating to causation.

### B. The Motions to Dismiss

The court examines below plaintiffs' compliance with each of the four requirements established in the order of July 20, 1999. *See supra* page 8.

#### 1. Each Plaintiff's Particular Injuries

Plaintiffs meet the requirements of the first portion of the court's order by specifying the specific injuries allegedly suffered by each. (*See* Second amended complaint ¶¶ 23, 31, 39, 47, 55, 63, 71, 79, 87.)

10

### 2. Chemicals Found in Each Plaintiff's Bloodstream

The second amended complaint summarizes the individual chemicals found in each plaintiff's bloodstream, with the exception of David Slaton. Blood tests revealed the following chemicals in the bloodstream of eight plaintiffs: (1) *Marion Webb*: 3-Methylpentane; (2) *Leroy Qualls*: Dichlorobenzes, 2-Methylpentane, 3-Methylpentane; (3) *Bradley Tipper*: Toluene, 2-Methylpentane, 3-Methylpentane, n-hexane; (4) *Omega Smith*: Dichlorobenzes, 2-Methylpentane, 3-Methylpentane; (5) *Charles Gray*: Toluene, n-hexane; (6) *Danny Gilchrist*: Benzene, Xylene, Trimethylbenzenes; (7) *Joseph Broadfoot*: 2-Methylpentane, 3-Methylpentane; (8) *Daniel Parker*: 3-Methylpentane. (*See id.* ¶¶ 24, 32, 40, 48, 64, 72, 80, 88.) A careful reading of this listing indicates that the chemical described as *3-Methylpentane* was detected in the bloodstreams of six of the eight plaintiffs listed (Webb, Qualls, Tipper, Smith, Broadfoot, and Parker), *2-Methylpentane* in the bloodstreams of four of the eight (Qualls, Tipper, Smith, and Broadfoot), *Dichlorobenzes* in two of the eight (Qualls and Smith), *Toluene* in two (Tipper and Gray), and *n-hexane* in two (Tipper and Gray). Plaintiff Danny Gilchrist stands alone; his bloodstream contained trace evidence of chemicals not found in any other plaintiff. These allegations also

11

meet the requirements of the court's order.

### 3. Defendants Responsible for Selling Chemicals Found in Each Plaintiff's Bloodstream

Even so, plaintiffs do not indicate which defendants are responsible for selling products containing the chemicals detected in their bloodstreams. Stated somewhat differently, plaintiffs do not allege that chemicals found in their bloodstreams are traceable to products manufactured by defendants.

Plaintiffs charge, for example, that Georgia Gulf manufactured "PVC," and that it contributed to their injuries. (*See id.* ¶¶ 25, 33, 41, 49, 57, 65, 73, 81, 89) Plaintiffs argue that PVC produces carbon monoxide, hydrochloric acid, and vinyl chloride when burned. (*See id.*) However, plaintiffs do not attempt to link that product, or any of the three compounds it allegedly produces when oxidized, to any of the chemicals detected in their respective bloodstreams.

Plaintiffs also charge that Monsanto manufactured "Santicizer," or butyl benzyl phthalate, and assert that it likewise contributed to their injuries. (*See id.* ¶¶ 26, 34, 42, 50, 58, 66, 74, 82, 90.) Plaintiffs argue that Santicizer produces carbon monoxide when burned. (*See id.*) Again, however, plaintiffs do not attempt to link that product, or the compound it allegedly produces when oxidized, to the chemicals detected in their

12

respective bloodstreams.

In like manner, plaintiffs charge that Beaver Adhesives manufactured "polyvinyl acetate," and say that it contributed to their injuries. (See id. ¶¶ 27, 35, 43, 51, 59, 67, 75, 83, 91.) They nevertheless fail to link that product to any of the chemicals found in any of their bloodstreams.

Similarly, plaintiffs charge that Lord Chemicals manufactured a chemical known as "U-273 photoglaze," and assert that it also contributed to their injuries. (See id. ¶¶ 28, 36, 44, 52, 60, 68, 76, 84, 92.) U-273 allegedly contains an unidentified blend of acrylate monomers. (See id.) Once more, however, plaintiffs do not attempt to link that product or its monomers to the chemicals detected in their respective bloodstreams.

Finally, plaintiffs charge that Occidental manufactured "PVC Homopolymer Resin," and allege that it also contributed to their injuries. (See id. ¶¶ 29, 37, 45, 53, 61, 69, 77, 85, 93.) Yet again, however, plaintiffs do not establish any linkage between that product and any chemical detected in the bloodstream of any plaintiff.

These facts reveal that plaintiffs' second amended complaint, including the exhibits attached thereto, fails to meet the third

13

requirement of the court's order. Simply put, plaintiffs fail to link any chemical detected in the bloodstream of any plaintiff to any product manufactured by any defendant.

Perhaps just as significantly, plaintiffs failed to elucidate in their second amended complaint, in any affidavit attached to it, in brief, or in oral argument, how the malfunction of a ventilation fan in Domco's plant caused any of the chemicals contained in any of the products manufactured by any defendant to be present in the "smoke" that allegedly filled the plant. The second amended complaint exacerbates the confusion, by stating that products manufactured by Georgia Gulf and Monsanto produce certain chemical compounds <u>when burned</u>. (*See, e.g., id.* ¶¶ 25, 26.) It now is clear that Domco's plant did not burn. See *supra* pages 4, 9. Rather, a fan motor overheated and shut down; but how that event is related to any product of any defendant is nowhere explained. Based on the allegations in the second amended complaint, therefore, it remains a mystery what caused products allegedly manufactured by defendants to burn, if in fact any of them were burned.

### 4. Causation under *Diversey*

The second amended complaint recites that "[i]t is the belief of the plaintiff's expert that [all nine plaintiffs were] also

14

exposed to carbon monoxide, vinyl acetate, acrylate monomer, 1-trichloroethane, methyl ethyl ketone, butyl benzyl phthalate, polyvinyl chloride, and vinyl chloride." (*Id.* ¶¶ 24, 32, 40, 48, 56, 64, 72, 80, 88.) These allegations, which reflect statements made by plaintiffs' expert Dr. Richard Lipsey, fail to establish the requisite causal linkage between plaintiffs' injuries and products manufactured by defendants. (*See id.* at Exhibit "2.")

In *Ex parte Diversey Corporation*, 1999 WL 424352 (Ala. June 25, 1999), the Supreme Court of Alabama reiterated what a plaintiff must allege in order to establish causation in cases based upon the AEMLD:

> "As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. On the other hand, if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence."

*Id.* at *5 (quoting *Southern Railway v. Dickson*, 100 So. 665, 669 (1924)). The *Diversey* court employed the stated rationale to conclude that the plaintiff in that case had failed to demonstrate

15

causation, because her expert testified that "any or all" of the chemicals to which plaintiff was exposed may have caused her injuries. *Id.* Despite the fact that defendant produced all but one chemical to which the plaintiff in *Diversey* allegedly was exposed, the Supreme Court of Alabama found the testimony of plaintiff's expert to be "mere conjecture." *Id.* at *6.

This court is cognizant of the fact that it must apply the substantive law of the State of Alabama, but federal procedural principles, in a diversity action. *See generally Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Evidentiary issues, such as the admissibility of expert testimony, are procedural in nature. *See Heath v. Suzuki Motor Corporation*, 126 F.3d 1391, 1395 (11th Cir. 1997), *reh'g denied*, 136 F.3d 143 (11th Cir. 1998). Thus, the Alabama Supreme Court's analysis in *Diversey* is persuasive, but not binding.[8] At bottom, this court grounds its analysis with respect to the admissibility

---

[8] This court also is mindful that the ultimate issue ruled upon by the Alabama Supreme Court in *Diversey* concerned causation under the AEMLD, not the admissibility of expert testimony. Because the admissibility of expert testimony was an issue "part and parcel" of the *Diversey* court's assessment of causation, that opinion could be construed as posing a mixed question of substantive and procedural law. Viewed in that light, the statements of the Alabama Supreme Court that deal with a substantive issue of law — the evidence that must be demonstrated for a plaintiff to establish the requisite element of causation in pursuing a claim under the AEMLD — are binding upon this court. Under either rubric, this court finds *Diversey* persuasive, given its similarity to the underlying facts here.

16

of Lipsey's affidavit on *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. *See Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999) (reiterating *Daubert*'s "gatekeeping" requirement, which charges a trial court with "ensur[ing] the reliability and relevancy of expert testimony"); *Allison v. McGhan Medical Corporation*, 184 F.3d 1300, 1311-12 (11th Cir. 1999) (noting that, under *Daubert*, trial court's "role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value"). In doing so, this court finds that Dr. Lipsey's stated opinions fail to describe, as the Alabama Supreme Court effectively and persuasively said, a "'logical sequence of cause and effect.'" *Diversey*, 1999 WL 424352 at *5 (implicitly applying *Daubert* analysis to expert's testimony regarding causation under the AEMLD). Lipsey made no effort to link the chemicals found in each plaintiff's blood to products manufactured by any defendant. The court finds persuasive the arguments of Beaver Adhesives' counsel on this point:

> In contrast, Dr. Lipsey's affidavit even provides <u>less</u> evidence of causation than did the affidavit of Dr. Brown. The conclusions contained in Dr. Brown's affidavit were at least premised upon the presence of

17

> chemicals in the bloodstream of the plaintiffs. In contrast, Dr. Lipsey's conclusion that the plaintiffs were exposed to vinyl acetate sold by Beaver Adhesives to Domco is based simply upon an <u>assumption</u> that the plaintiffs were exposed to vinyl acetate on account of the symptoms exhibited by them, when admittedly no evidence of such exposure exists in the blood of the plaintiffs.

(Beaver Adhesives' brief in support of motion to dismiss, at 8-9 (emphasis in original).) Indeed, Lipsey merely concluded that the symptoms exhibited by a majority of the plaintiffs indicated that a number of chemicals were present in the air. (*See* Lipsey affidavit ¶¶ 5-6.) Lipsey then associated these chemicals with products sold by the defendants:

> The irritated eyes, nose, throat, and lungs with resulting sinusitis, bronchitis, and other respiratory symptoms probably resulted primarily from exposure to carbon monoxide, hydrochloric acid, and vinyl chloride from burning PVC from Georgia Gulf and Occidental Chemical Corporation. ... Monsanto's Santicizer ... has a safe level of only 5 mg/cubic meters of air and was probably exceeded as well. ... Beaver's polyvinyl acetate has an OSHA PEL of on[ly] 10.0 PPM and causes skin irritation, eye, nose and throat irritation, cardiac problems and bronchitis. Lord's U-273 product contains an unidentified blend of acrylate monomers which the company will not identify, but they admit that it causes chronic health problems such as SOB [shortness of breath], chest pain, skin irritation including dermatitis, eye irritation and lung irritation.

(*Id.* ¶ 17.)

Lipsey proceeds primarily in a "backwards" fashion,[9] and fails

---

[9] Paragraph 5 of Lipsey's affidavit illustrates this point: "Carbon

18

to attribute any real causation to the defendants, particularly Beaver Adhesives and Lord Chemical. As to the other three defendants, Lipsey provides no link between certain chemicals alleged to be in the air and chemicals found in plaintiffs' bloodstreams. Similar to the expert testimony in *Diversey*, Lipsey's allegations of causation are "without selective application." Under *Daubert* and its progeny, Lipsey's testimony is neither relevant nor reliable in allocating responsibility to or among defendants for plaintiffs' alleged injuries.

### III. CONCLUSION

Plaintiffs' failure to comply with this court's order of July 20, 1999, warrants dismissal of their second amended complaint. *See Friedlander v. Nims*, 755 F.2d 810, 813 (11th Cir. 1985) ("A district court may dismiss a case for failure to comply with the pleading rules. Although this is a severe sanction, its imposition is justified when a party chooses to disregard the sound and proper directions of the district court."); *see also Welch v. Laney*, 57 F.3d 1004, 1009 (11th Cir. 1995) (district court did not err in dismissing portion of plaintiff's second amended complaint upon

---

monoxide appears to me one of the toxic chemicals in the air that day <u>based on the symptoms of the workers</u>. Other chemicals which were present in the air <u>based on the resulting symptoms</u> are: vinyl acetate, acrylate monomer, ...." (Lipsey affidavit ¶ 5 (emphasis supplied).)

19

failure to plead properly a claim under 42 U.S.C. § 1983). An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this 10th day of January, 2000.

_____
United States District Judge